**In the Matter of Hunter Press, Incorporated.**

**HUNTER PRESS, INCORPORATED, Appellee,**

v.

**CONNECTICUT BANK AND TRUST COMPANY, Appellant.**

No. H–74–528.

United States District Court, D. Connecticut.

Sept. 22, 1976.

Jon D. Schneider, Goodwin, Procter & Hoar, Boston, Mass., for appellee.

Stanford N. Goldman, Jr., Schatz & Schatz, Hartford, Conn., for appellant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This case is here on appeal from an order of the Bankruptcy Court, Seidman, J., declaring invalid the July 18, 1974 attachment by appellant Connecticut Bank and Trust Company ("CBT") of real property owned by Hunter Press Incorporated ("Hunter Press"). Following the attachment, on August 14, 1974, three creditors filed an involuntary bankruptcy petition against Hunter Press in United States District Court. In November 1974, on petition by Hunter Press, the proceedings were converted to

Chapter XI. The Bankruptcy Court declared the attachment void under § 67a(1)(a) of the Bankruptcy Act as a lien obtained within four months of filing while the debtor was insolvent.[1] Both sides concede that the attachment occurred within the statutory four month period. Appellant, however, sharply disputes the Bankruptcy Judge's determination that Hunter Press was insolvent on July 18, 1974.

Bankruptcy Rule 810 dictates that this court must accept the Bankruptcy Judge's findings of fact unless they were "clearly erroneous," but can otherwise affirm, modify, reverse or remand his judgment. *In re Securities Investor Protection Corp.*, 414 F.Supp. 679 (D.Minn.1975).

### Factual Background

In July 1973, Hunter Press, a printing firm, was taken over by new management who obtained a line of credit from James Talcott, Inc. ("Talcott"). Talcott in return received a security interest in all of Hunter Press's inventory, accounts receivable, other personal property, and certain of its real estate. Hunter Press in April 1974 executed an unsecured 90-day promissory note for $85,000 with CBT. When Hunter Press could not repay the note, CBT attached the real property. Talcott immediately took possession of the business, completed work in progress, collected accounts receivable, and liquidated the personal property. As a result of this liquidation by public auction on October 8, 1974, Talcott realized a gross total of $272,106.65. After deduction of expenses of $77,106.65 and the secured debt owed to it, $168,500, Talcott turned over $26,500 to the Bankruptcy Court. The debtor's real estate was sold at public auction on November 19, 1975 for $200,000, with auction expenses of $5,000. The buyer assumed a tax debt of $50,000 due on the property.

The Bankruptcy Court valued Hunter Press's assets as of July 18, 1974, the date of attachment, at $440,000:

$195,000  in personal property ($272,106.65 less expenses of $77,106.65)

245,000  in real property ($200,000 plus $50,000 in taxes assumed by buyer less $5,000 auction expenses).

—————

$440,000

In finding Hunter Press was insolvent, the court concluded the debtor's liabilities were $561,500. The parties had stipulated $511,500 of said liabilities. To that sum, Judge Seidman added $50,000 as an approximation of real estate taxes due the city of Hartford, which had accrued on the real property between the time of attachment and the auction sale in November 1975.

Appellant CBT argues that the Bankruptcy Court incorrectly determined the value of Hunter Press's assets and liabilities. First, CBT maintains that the fair value of the personal property was the gross amount received at auction, $272,106.65, with no deduction for costs and expenses. Secondly, appellant claims the court erred in valuing the real property at the net price (adjusted for costs and the assumption of taxes) obtained at an auction conducted over a year after the date of attachment. Rather, CBT advances several appraised values for the property, the lowest of which is $300,000. Finally, CBT contends that it was error to go beyond the stipulated $511,500 of liabilities by adding $50,000 in real estate taxes that accrued after the date of attachment. If all three of appellant's claims are accepted, Hunter Press's assets would total $572,106.65 and exceed its liabilities by $60,606.65.

### Personal Property

In assessing the value of Hunter Press's personal property the Bankruptcy Court

1. Section 67a(1)(a) provides in relevant part: "Every lien against the property of a person obtained by attachment . . . within four months before the filing of a petition initiating a proceeding under this title by or against such person shall be deemed null and void (a) if at the time when such lien was obtained such person was insolvent." 11 U.S.C. § 107a(1)(a).

used the net price received at auction after deducting auctioneer's commissions, attorneys' fees and other costs. Appellant argues that the value of the personal property as of the date of attachment was equal to at least the gross amount realized at auction without deduction for costs. Surprisingly, neither the statute nor the cases directly resolve the question whether the costs of sale should be considered in determining the fair value of assets for purposes of the Bankruptcy Act.

■ Insolvency under the bankruptcy laws is determined by the so-called "Balance Sheet" rule.[2] Section 1(19) of the statute provides that a person shall be deemed insolvent whenever "the aggregate of his property . . . shall not at a fair valuation be sufficient in amount to pay his debts."[3] Fair valuation according to *Collier* "signifies the reasonable estimate of what can be realized from the assets by converting them into, or reducing them to, cash under carefully guarded, if not idealized, conditions." 1 *Collier on Bankruptcy,* ¶ 1.19 at 121 (14th ed. 1974). It is clear from the cases that a distressed or forced sale price is not the proper standard. *Syracuse Engineering Co. v. Haight,* 110 F.2d 468, 471 (2d Cir. 1940); *Stern v. Paper,* 183 F. 228, 231 (D.N.D.1910), *aff'd,* 198 F. 642 (8th Cir. 1912); *Darby v. Shawnee Southwest, Inc.,* 399 F.Supp. 587, 591 (W.D.Okl. 1975). In the leading case of *Syracuse Engineering Co.,* 110 F.2d at 471, Judge Clark commented:

"Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. . . . It involves a val-

ue that can be made available for payment of debts within a reasonable period of time. . . . And fair market value implies not only a 'willing buyer', but a 'willing seller.' "

■ In determining what such a willing buyer might pay a willing seller, I conclude that one should not take into account the auction costs of selling the property. The balance sheet approach calls upon the court to compare the value of the assets and the amount of liabilities of the bankrupt at the time of the attachment. The value of these assets is, according to Judge Clark, its fair market price, what a willing buyer would pay for these assets under ordinary selling conditions. Clearly that market price would not include any of the costs of sale. An auction sale to liquidate property is moreover not generally a normal selling condition. To deduct from the market price the costs of such a liquidating auction would be inconsistent with the balance sheet approach and unfairly decrease the value of the debtor's assets.

■ No case that appellee cites, nor any other that has come to my attention, supports the conclusion below that the cost and expense of liquidation should be deducted from the value of the assets.[4] To be sure, in valuing accounts receivable and old debts, they must be discounted to reflect the risks and costs of collection. *Cf. Irving Trust Co. v. Manufacturers Trust Co.,* 6 F.Supp. 185, 187 (S.D.N.Y.1934). As Judge Learned Hand noted in *Coyle v. Archibald McNeil & Sons Co.,* 284 F. 298, 300 (S.D.N.Y.1922), "the fair [market] value of a claim known to be subject to doubtful and extended litigation . . . is less than its face under any method of appraisal." But such a discount goes to the market price of the asset itself and not any cost of sale.

One must distinguish between expenses incurred to render the property marketable

---

2.  For a criticism of this rule, *see* L. Levit, *The Archaic Concept of Balance Sheet Insolvency,* 47 Am.Bankr.L.J. 215 (1973).

3.  11 U.S.C. § 1(19).

4.  In *Darby v. Shawnee Southwest, Inc.,* 399 F.Supp. 587 (W.D.Okl.1975), upon which appellee relies, the court decided only that the fair value of certain carpet stock was its inventory rather than retail price because the possibility of such retail sales within a commercially reasonable time was remote and speculative.

and costs attributable solely to selling it. In *In re Schindler,* 223 F.Supp. 512 (E.D.Mo. 1963), *rev'd on other grounds sub nom. American National Bank & Trust Co. v. Bone,* 333 F.2d 984 (8th Cir. 1964), which Hunter Press cites, the district court determined the value of certain crops, livestock, and real estate of the debtor farmer. The crops and livestock were sold after the alleged preferential transfer for $36,583.79. From that sum, the court found it necessary to deduct the cost of feed and labor incurred subsequent to the transfer in raising the products. These expenses, however, added to the value of the property and were not merely incident to the selling of it. In evaluating the fair value of the farm real estate for which there had been both an auction sale and private negotiations to sell, neither the district court nor the Court of Appeals for the Eighth Circuit even suggested it was necessary to deduct from the market price the costs of negotiation or the expenses of the auction.[5] *Schindler* on appeal cuts particularly against appellee since the Court of Appeals rejected both the auction price and negotiated sale price of the farm in favor of higher appraised values. Moreover, in no insolvency case that has come to my attention did a court consider attorneys' fees or title search expenses in finding the value of real property.

In the instant case, Talcott realized $272,106.65 from the liquidation of the personal property and incurred $77,106.65 in related costs. Unfortunately, the precise nature of these expenses is not clear from the record. Following CBT's attachment, Talcott took possession of Hunter Press, completed work in progress, collected accounts receivable, and sold the rest of the personal property at auction. Appellee characterizes these expenses relating to Talcott's liquidation as "operating expenses, legal fees, etc."[6] Appellant calls the moneys "auctioneer's commissions, costs, and attorneys' fees."[7] On remand, it will be necessary for the Bankruptcy Judge to decide which of these expenses were necessary to make the goods marketable or added value to them and which related only to the sale. While there are undoubtedly grey areas in using such a test, auctioneer's commissions and legal fees concerning the auction should not be considered in determining the fair value of the property. On the other hand, costs incurred by Talcott subsequent to the attachment to complete unfinished job work or collect accounts receivable should enter into a fair valuation of these assets.

### Real Property

The Bankruptcy Court valued the Hunter Press real estate as of July 18, 1974 at $245,000. This amount was based upon its sale price at a November 1975 auction for $200,000, the buyer assuming $50,000 in back taxes, less $5,000 in expenses. CBT, relying on testimony by appraiser Kenneth Libbey, argues that the property was worth at least $300,000 on July 18, 1974. At the hearing below, CBT offered two other appraisals of the value of the real property, but each of those valuations referred to determinations made over a year before the date of attachment.[8] The witnesses conceded that the market had declined substantially between the dates of those appraisals and the time of attachment.

Real property like personal property under the Bankruptcy Act is valued at its fair market price—"a value that can be made available for payment of debts within a reasonable period of time." *Syracuse Engineering Co.,* 110 F.2d at 471. What was actually realized in the bankruptcy proceeding is definitely relevant in assessing its value. *Irving Trust Co.,* 6 F.Supp. at 187.

---

5. This is peculiar in the light of appellee's contentions since *Schindler* was an extremely close case in which the district court found an estate of over $500,000 insolvent by $818.68.

6. Brief for Appellee at 12.

7. Brief for Appellant at 11.

8.

| Appraiser | Date | Value |
|---|---|---|
| Karl Kaffenberger | November 1972 | $400,000 |
| Joseph P. Kennedy & Co. | January 1973 | 510,000 |

Section 67a(1)(a) is clear, though, that one must look to the time when "such lien was obtained" in determining if the debtor was insolvent.

▮ CBT places its chief reliance on the appraisal of $300,000 done by Kenneth Libbey on January 14, 1976. While Mr. Libbey suggested that the market for such property declined further between July 1974 and January 1976, he indicated he would not place a higher appraisal value on the real estate in 1974. Upon questioning by the court, Mr. Libbey revealed that he mistakenly believed that the property had sold for $300,000, not $250,000. The following colloquy took place between court and witness:

"THE COURT: Would you say that when this property sold for two hundred and fifty thousand dollars that that was a fair market value? Several months ago?
"THE WITNESS: Well, there was a fifty thousand tax on it. So, actually it was three hundred thousand dollars.
"THE COURT: No, no. It was two hundred thousand dollars plus taxes.
"THE WITNESS: Oh, well, I think it might be a little low, but there are not very many buyers for this type of property.
"THE COURT: And you wouldn't quarrel too much with that as a fair price?
"THE WITNESS: No."[9]

Mr. Libbey also testified that the auction price is often a fair reflection of the value of real property.

I must accept the factual findings of the Bankruptcy Judge unless they are clearly erroneous. I cannot say that there was no substantial basis in the record for that court's decision that the gross value of the Hunter Press real estate equaled $250,000. Commercially reasonable efforts to sell the property were made continually from July 1974 through November 1975. The sole definite buyer offered only $175,000. Mr. Libbey, appellant's own witness, conceded that $250,000 was a fair price and that the market had not changed greatly between July 18, 1974 and the time of the auction sale. Hunter Press in 1974, while not a "dead" concern, was still a failing one. The proper valuation here and the weight to be given the appraisal testimony were fact questions depending on the credibility of the expert witnesses. Though a forced sale is not the proper test of fair valuation, I cannot say the Bankruptcy Court was erroneous in relying on the amount realized at auction in this case.

▮ The court below did err in deducting from this market price the $5,000 in costs incurred in the auction. For the reasons discussed above concerning the value of the personal property, the expenses relating solely to the sale of the asset ought not to be subtracted from the market price in determining its fair valuation under the bankruptcy laws. On remand, the Bankruptcy Court must determine if all the $5,000 represent costs attributable to the auction of the property.

### Tax Liability

▮ The Bankruptcy Court went beyond the parties' stipulation of liabilities by adding $50,000 as an approximation of real estate taxes accruing between the date of attachment and the time of sale. No evidence was ever presented as to the exact amount of this liability. Section 67a(1)(a) of the Bankruptcy Act provides that an attachment placed within four months of the debtor's bankruptcy is void if "*at the time when such lien was obtained,* such person was insolvent." (Emphasis supplied). One must value the assets and liabilities of the debtor as of the date of the attachment. The Bankruptcy Judge erred as a matter of law in looking to the date of sale in determining Hunter Press's liabilities. Appellee argues that it normally takes between one to four years to dispose of real property of this nature, and thus one should take carrying charges attendant to this delay into account. This theory ignores

---

**9.** *In the Matter of Hunter Press,* hearing before the Bankruptcy Court, Bankruptcy No. H–74–528, 34–35 (D.Conn. Jan. 15, 1976).

the command of the statute which calls for a balance sheet assessment of the debtor as of the date of attachment. Moreover, any such delay is already reflected in the capitalization rate used to find the appraised value. Mr. Libbey testified that in determining the market price of the real estate, he discounted the value to take such carrying charges into account.[10] I conclude therefore that the court below should not have added $50,000 to the stipulated $511,500 in liabilities.

### Conclusion

To summarize, I find that the Bankruptcy Court incorrectly deducted costs relating to the sale of the personal property and real property from the fair value of these assets. In addition, the court was mistaken in adding to the debtor's liabilities an approximation for real estate taxes accruing after the date of attachment. Hunter Press's assets might conceivably equal $522,106.65 and exceed its liabilities by $10,606.65. The errors are, hence, of sufficient magnitude to require that the case be remanded to the Bankruptcy Judge for a hearing on the nature of the expenses to determine whether they were incurred in rendering the property marketable or were solely incident to the sale.

The case is remanded to the Bankruptcy Court for further proceedings in conformity with this opinion.

SO ORDERED.

---

**10.** Mr. Libbey was asked, "When you say three hundred thousand dollars and you have to anticipate carrying it a year, you are not saying it is three hundred thousand less the twenty-seven thousand? You have figured that into it." WITNESS: "Yes." *Id.* at 35.