In re PIONEER HOME BUILDERS, INC. d/b/a Cherry Leaf Duplexes, d/b/a El Marco Apartments, d/b/a Rainbow Hills Duplexes, and d/b/a Potranco Road Bldg., Debtor.

PIONEER HOME BUILDERS, INC., Plaintiff,

v.

INTERNATIONAL BANK OF COMMERCE, Defendant.

Bankruptcy No. 90–52754–LMC.
Adv. No. 92–5011–LMC.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Nov. 20, 1992.

Leonard H. Simon, Todd J. Zucker, Houston, TX, for debtor and plaintiff.

Diann M. Bartek, Donna K. McElroy, San Antonio, TX, for defendant, Intern. Bank of Commerce.

## DECISION ON COMPLAINT OBJECTING TO CLAIM AND SEEKING TO RECOVER FRAUDULENT TRANSFERS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for trial the Complaint of Pioneer Home Builders, Inc., (the "Debtor"), against the International Bank of Commerce, ("IBOC"), objecting to IBOC's unsecured deficiency claim and seeking to avoid alleged fraudulent transfers pursuant to 11 U.S.C. § 548 and §§ 24.003, 24.005, and 24.006 of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). This court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(b)(2)(F), (H) and (O). This is a core proceeding. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

At the close of plaintiff's case, defendant moved for judgment, on grounds that plaintiff had failed to establish that it was rendered insolvent or was left with unreasonably small capital as a result of the transfers. This court granted that motion, for the reasons stated in this decision.

### FACTUAL BACKGROUND

The Debtor formerly engaged in the sale of undeveloped or partially developed property for residential use. One tract so developed was 155.18439 acres of land, subdivided into 165 lots in Medina County, Texas, commonly known as Cattleman's Crossing Subdivision, Unit 1 ("Cattleman's Crossing"). On July 30, 1987, the Debtor executed a real estate lien note in the principal amount of $956,900.00 in favor of IBOC, as payee (the "IBOC Note"). The IBOC Note was secured by 116 of the Cattleman's Crossing lots (the "Collateral Property"), as well as with certain notes receivable, payable to the Debtor by third party purchasers of lots of Cattleman's Crossing (the "Collateral Notes").

The Debtor became unable to service the IBOC Note. Subsequently, IBOC posted the Collateral Property for foreclosure. IBOC conducted a foreclosure sale on November 7, 1989. On that date, the principal plus interest due on the IBOC Note was $1,073,478.29. At the foreclosure sale, IBOC purchased one hundred and eleven (111) of the 116 lots making up the Collateral Property, for the sum of $368,881.00. That sum was credited against the outstanding principal and interest balance on the IBOC Note.

IBOC held a second foreclosure sale of 24 of the Collateral Notes on December 21, 1989. IBOC purchased the 24 Collateral Notes for the sum of $225,000.00 and credited that amount against the outstanding principal and interest balance on the IBOC Note. The Debtor transferred an additional eight (8) Collateral Notes to IBOC on February 13, 1990, for the sum of $75,000.00, also credited against the amounts owing under the IBOC Note. Also on February 13, 1990, the Debtor deeded eighteen (18) lots of the Collateral Property to IBOC for a credit of $63,141.80 against the balance of the IBOC Note.

On September 4, 1990 (the "Filing Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). After applying the sales proceeds received by IBOC from the aforementioned foreclosure actions and deeds in lieu of foreclosure transfers, IBOC claimed an unsecured deficiency against the Debtor's bankruptcy estate in the amount of $372,127.41.

## DISCUSSION

### WERE THE TRANSFERS OF THE DEBTOR'S PROPERTY TO IBOC FRAUDULENT TRANSFERS?

Both the Bankruptcy Code[1] and TUFTA[2] authorize certain transfers to be set aside as fraudulent if, at the time of the transfers, the debtor was insolvent and the debtor received less than reasonably equivalent value for the property transferred or if the transfers left the debtor with unreasonably small capital. The Debtor employs these statutory authorities in requesting that this Court disallow IBOC's deficiency claim and compel IBOC to return to the Debtor the value of the Collateral Property.

#### 1. *The Debtor's Insolvency*

As a threshold matter, the court must determine whether the Debtor was insolvent at the times of the transfers of the Collateral Property and the Collateral Notes. Under the Bankruptcy Code, an entity is insolvent where its financial condition is "such that the sum of such entity's debts is greater than all of such entity's property, *at a fair valuation....*" 11 U.S.C. § 101(32). TUFTA requires a similar analysis of the debtor-transferee's finances. *See* Tex.Bus. & Com.Code Ann., § 24.003(a) (Vernon 1987).

At trial, the Debtor offered testimony and an evidentiary proffer of its expert, Mr. Woller, who placed a value on the Collateral Property. The Debtor presented evidence as well to establish, based mainly on the valuations of Mr. Woller, that the Debtor's liabilities exceeded the value of the Debtor's assets at the times of transfer. However, in his analysis, Mr. Woller deducted from the value of the Collateral Property expenses involved with the selling of the Collateral Property, including real estate transfer taxes, closing costs, cost of septic tank installations, commissions, developer's profit and risk. IBOC's counsel argued that the Debtor could not meet the statutory tests of insolvency under the Bankruptcy Code or TUFTA, before or after the disputed transfers, if the Debtor's real estate transfer tax assumptions were excluded from the Debtor's asset valuation model. Accordingly, the court examined whether a reduction in the value of the Debtor's real property by real estate transfer taxes incurred upon hypothetical sales was a fair valuation of the Debtor's assets.

■ Traditionally, courts have employed a "balance sheet test" to determine a debtor's insolvency. *See, e.g., Contructora Maza, Inc. v. Banc de Ponce,* 616 F.2d 573, 577 (1st Cir.1980) (using balance sheet test); *Syracuse Engineering Co., Inc. v. Haight,* 110 F.2d 468, 471 (2d Cir.1940) (same). This balance sheet test was used under the Bankruptcy Act, and Congress intended that courts continue to use it under the Bankruptcy Code.[3]

■ The law is well settled that the value of an asset under the balance sheet test is neither the asset's value in the best case,

---

**1.** 11 U.S.C. § 548(a)(2) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

**2.** § 24.006(a) of the Texas Uniform Fraudulent Transfer Act provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex.Bus. & Com.Code Ann., § 24.006(a) (Vernon 1987).

**3.** The legislative history to the Bankruptcy Code definition of "insolvent" provides:

The definition of "insolvent" in paragraph (25) is adapted from section 1(19) of current law. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently transferred. It is the traditional bankruptcy balance sheet test of insolvency.

H.Rep. No. 95–595, 95th Cong., 1st Sess. 312 (1977), *reprinted in* 2 Appendix Collier on Bankruptcy 312 (15th ed. L. King 1992).

nor is it the asset's value in the worst case. *See, e.g., Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley)*, 93 B.R. 925, 927 (Bankr.W.D.Tex.1988). Rather, most courts have assigned assets their market value at the time of the disputed transfers when assessing asset values. *See Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985) (balance sheet test focuses on fair market value of debtors assets and liabilities within reasonable time of transfer). "[F]air market price is the most equitable standard." *Syracuse Engineering Co. v. Haight*, 110 F.2d 468, 471 (2d Cir.1940) (citations omitted). Assets, therefore, are best valued by determining what price they would bring on the open market. *See Energy Cooperative, Inc. v. Cities Service Co. (In re Energy Cooperative)*, 109 B.R. 822, 824 (N.D.Ill.1989); *Sleepy Valley*, 93 B.R. at 927 (Bankr.W.D.Tex.1988); *cf. Excello Press, Inc. v. Bowers, Inc. (In re Excello Press, Inc.)*, 96 B.R. 840, 842 (Bankr.N.D.Ill.1989) (fair value is what can be realized from converting assets into cash). An open market value, or simply, market value, has been further defined as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller. *See Grandison v. National Bank of Commerce of Rochester*, 231 F. 800, 804–05 (2d Cir.1916); *Irving Trust Co. v. Manufacturers' Trust Co. (In re John Connors, Inc.)*, 6 F.Supp. 185, 187 (S.D.N.Y.1934).

Under this willing buyer/willing seller approach to valuing assets, it is not appropriate to deduct the costs and expenses associated with the sale of the assets. In determining a debtor's insolvency, a court must examine the actual values of the assets and not arbitrary values assigned by the debtor. *See Shaw v. United States Rubber Co., Naugatuck Chemical Division*, 361 F.2d 679, 682 (5th Cir.1966) (depreciated cost improper method).

> The balance sheet approach calls upon the court to compare the value of the assets and the amount of liabilities of the bankrupt at the time of the transfer. The value of these assets is ... its [sic] fair market price, what a willing buyer would pay under ordinary selling condi-

tions. Clearly, that market price would not include any of the costs of sale.

*See Hunter Press, Inc. v. Connecticut Bankr & Trust Co. (Matter of Hunter Press)*, 420 F.Supp. 338, 341 (D.Conn.1976). The method of market price valuation focuses on what a willing buyer would *pay*, not necessarily what a willing seller would ultimately *receive*. Accordingly, the Debtor as seller may not reduce the value of its assets by real estate transfer taxes which might be incurred incident to sale.

Of course, the value of an asset may be reduced by factors regarding the difficulty of the sale of the asset. *See, e.g., Coyle v. Archibald McNeil & Sons Co.*, 284 F. 298, 300 (S.D.N.Y.1922) (fair market value lower than face value if property subject of extended litigation); *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.)*, 93 B.R. at 931 (reduction in value appropriate where no ready market). However, such factors affect the market price of the asset and do not relate to the cost of sale. *See Hunter Press*, 420 F.Supp. at 341.

The balance sheet value of an asset may be further adjusted by the net cost of making the asset marketable. Expenditures made to increase the value of the asset may be considered in asset valuation, as such expenses are "not merely incident to the selling of it." *See Hunter Press*, 420 F.Supp. at 341–42 (improper to include attorneys fees or title search expenses to value real property).

■ "A fair valuation" of a debtor's assets, therefore, must concern itself with the price a debtor could obtain at open market, not the net proceeds of the sale. A balance sheet, after all, is a financial snapshot of the debtor, used for a comparison of assets to liabilities. To reduce the value of a debtor's assets by the hypothetical costs associated with the sale of the assets, such as real estate transfer taxes, is to distort the focus of the debtor's financial picture. "[I]t is the actual, rather than the theoretical condition of the debtor which determines [insolvency]." *See Mitchell v. Investment Securities Corp.*, 67 F.2d 669,

671 (5th Cir.1933). We conclude, therefore, the Debtor was not insolvent at the time of the transfers nor did the Debtor become insolvent as a result of the transfers. Accordingly, the transfers were not fraudulent under either 11 U.S.C. § 548(a)(2)(B)(i) or TUFTA § 24.006(a).[4]

The court in passing notes that it rejects the plaintiff's contention that "fair valuation" as that term is used in both 11 U.S.C. § 548 and TUFTA § 24.006(a) means the same thing as "fair valuation" as sometimes used by appraisers. In recent years, certain regulatory agencies, such as the Federal Home Loan Bank Board, for example, have insisted that certain lending institutions have property appraised at what they described as "fair valuation," a term of art defined (in general) as the fair market value of a given piece of property, discounted by the amount of time one would expect to have to expose the property to the market in order to sell it. The discounting process is an attempt to account for the time value of money, which the lending institution would forego as a result of how long it would take to sell the property. Once one "buys in" to this approach to valuation, it is an easy step to back out other costs and charges associated with getting the property sold, such as the cost of real estate taxes which would have to be paid during the marketing period, the cost of marketing the property through a broker, and so forth.

Although the words are the same ("fair valuation"), the contexts are completely different, and so also is the meaning of the term depending on the context. The term found in the fraudulent conveyance statutes has been in use for many years, long before the banking regulatory agencies infused the words with their special meaning in the middle 1980's. Moreover, the thrust of the term, as indicated in the commentary to the Uniform Law, as well as in the cases which have construed the law over the years, is clearly a directive to seek out the *fair market value* of the debtor's property, not the discounted or liquidation value suggested by the term's meaning in the context of the banking regulations. *See Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. at 927, and cases cited therein; *see also* discussion *supra.* The plain meaning of the words cannot be divorced from the context in which they are imbedded. *See United States v. Ron Pair Enterprises, Inc. (In re Ron Pair Enterprises, Inc.),* 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *see also United States v. Nordic Village, Inc. (In re Nordic Village, Inc.),* —— U.S. ——, ——, 112 S.Ct. 1011, 1016, 117 L.Ed.2d 181 (1992). Even if we were to assume that the term means the same thing in both contexts (despite their disparity), we would then have to assume that the earlier use (and its attendant meaning) would inform the later use, not the reverse, as debtor suggests. *See Ron Pair, supra.* In point of fact, the regulators expressly defined the term "fair valuation" in a rather unexpected way for the specific purpose of distinguishing the value they intended appraisers to find *from* the usual notions of "fair market value" and "market value" traditionally used in appraisal methodology. This highly specialized usage tells us nothing about what the term means as used in statutes drafted decades before these banking regulations were ever promulgated. The plaintiff's argument on this point must therefore be rejected.

### 2. Unreasonably Small Capital

■ Regardless of a finding of insolvency, both the Bankruptcy Code [5] and TUF-

---

**4.** Both 11 U.S.C. § 548(a)(2)(A), (B)(i) and TUFTA § 24.006(a) require conjunctive findings of the Debtor's insolvency and a transfer for less than reasonably equivalent value. As the Court has determined that the Debtor was not, and did not become, insolvent as a result of the transfers, the Court need not discuss the extent of the value given for the transfer to determine that the Debtor may not avoid the transfer.

**5.** Under the Bankruptcy Code, a debtor in possession may avoid transfers in which the debtor in possession received less than reasonably equivalent value and "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." *See* 11 U.S.C. § 548(a)(2)(B)(ii).

TA [6] allow the avoidance of transfers which financially cripple a debtor and leave it with unreasonably small capital.

Neither TUFTA nor the Bankruptcy Code define "unreasonably small" in regard to a debtor's capital structure. This court shares the views of other courts which have held that unreasonably small capital indicates a financial condition short of insolvency. *See, e.g., Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr.D.Mass.1991) ("[u]nreasonably small capitalization need not be so extreme a condition of financial debility as to constitute equitable insolvency"). Recently, the Third Circuit has held that a financial condition involving unreasonably small capital means that there is a general inability to generate enough cash flow to sustain operations. *See Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3rd Cir.1992). Although short of technical insolvency, a debtor's unreasonably small capital structure is presumed to lead eventually to insolvency, which is why it serves as grounds for treating the transfer in question as fraudulent *vis-a-vis* other unsecured creditors. *See In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr.D.Mass.1989).

In analyzing the capital structure of a debtor, a court must "examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable." *See Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 999 (Bankr.S.D.Ohio 1990). A court must look to an entity's financial statements in light of the entity's need for capital during the time-frame in question. *Id.*

At trial, representatives of the Debtor testified that the Debtor was having difficulty paying its debts as they came due *before* the transfers of the Collateral Property and the Collateral Notes.[7] Thus, the transfers in question did not leave the debtor with unreasonably small capital—that was a problem the debtor had already. For avoidance purposes, both the Bankruptcy Code and TUFTA require that the disputed transfers *cause* the unreasonably small capital condition. The statutes require a finding that the capital remaining with the debtor as a result of the transfer is unreasonably small. *See* 11 U.S.C. § 548(a)(2)(B)(ii); Tex.Bus. & Com.Code Ann., § 24.005(a)(2)(A) (Vernon 1987). Where a debtor already has unreasonably small capital, that the debtor subsequently engaged in transfers which worsened, but did not cause, its financial infirmities, will not subject those transfers to avoidance as fraudulent conveyances. This court holds, therefore, that the transfers of the Collateral Property and the Collateral Notes are not avoidable by the Debtor as fraudulent transfers since the Debtor had unreasonably small capital before any such trans-

---

**6.** § 24.005 of the Texas Uniform Transfer Act provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose within a reasonable time before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

Tex.Bus. & Com.Code Ann., § 24.005(a)(2)(A) (Vernon 1987).

**7.** Although a debtor may not be able to meet its financial obligations as they mature, this does not necessarily mean that the debtor was insolvent in the legal sense. *See Berstein v. South Central Bell Telephone Co.*, 730 F.2d 987, 991 (5th Cir.1984) (quoting *Lang v. First National Bankr of Houston*, 215 F.2d 118, 120 (5th Cir. 1954)). Furthermore, a finding of insolvency *ipso facto* requires a finding of unreasonably small capital, *see United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556, 580 (M.D.Pa.1983), *modified sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd. Cir.1986), *cert. denied sub nom., McClelland Realty Co. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), however the inverse is not

fers.[8]

## CONCLUSION

This court finds that the Debtor was not insolvent at the times of transfer of the Collateral Property or the Collateral Notes, and such transfers of the Debtor's property may have aggravated, but did not cause, the Debtor's unreasonably small capital.

Having made its findings of fact and conclusions of law herein, the court will enter judgment for the Defendant, and the transfers of the Debtor's property may not be avoided.

true; a finding of unreasonably small capital does not require a determination of insolvency.

8. Both 11 U.S.C. § 548(a)(2)(A), (B)(ii) and TUFTA § 24.005(a)(2)(A) require conjunctive findings of the debtor's unreasonably small capital and a transfer for less than reasonably equiva-