NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4356
_____

In re: SEMCRUDE L.P.,

Debtors


BETTINA WHYTE,
as the Trustee, on behalf of SemGroup Litigation Trust,

Appellant
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 1-13-cv-01375, 1-13-cv-01376)
District Judge: Honorable Sue L. Robinson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 25, 2016
_____

Before: VANASKIE, SHWARTZ, and KRAUSE, *Circuit Judges*

(Filed: April 28, 2016)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VANASKIE, *Circuit Judge.*

The Bankruptcy Trustee appeals adverse judgments in actions she brought to set aside two equity distributions as constructively fraudulent conveyances. She argues that the Bankruptcy Court erred in granting partial summary judgment on her claim that the equity distributions, made in August 2007 and February 2008, left the debtor with unreasonably small capital, and that the Bankruptcy Court again erred during the trial in permitting expert witness testimony on the question of whether the debtor was insolvent at the time of the February 2008 equity distribution. Discerning no error in the Bankruptcy Court's rulings, we will affirm.

I.

We write primarily for the parties, who are familiar with the facts and procedural history of this case. Accordingly, we set forth only those facts necessary to our analysis.

SemGroup, L.P. was a "midstream" energy company that filed for bankruptcy in July 2008. At one point, SemGroup was the fifth-largest privately held company in the United States. SemGroup's primary business consisted of providing transportation, storage, and distribution of oil and gas products to oil producers and refiners. In connection with its business, SemGroup also traded options on oil-based commodities.

To maintain its operations, SemGroup depended on credit facilities for capital. From 2005 through July 2008, SemGroup had a significant line of credit from a syndicate of over 100 different lenders (the "Bank Group"). This line of credit was secured pursuant to a Credit Agreement. As a part of this Credit Agreement, SemGroup agreed

2

not to trade "naked options"—trades where the security is neither offset by other trades nor backed by physical inventory. Nevertheless, SemGroup's trading activity involved trading naked options, which carried significant risk and was inconsistent not only with the Credit Agreement, but also SemGroup's risk management policy.

In addition to trading naked options, SemGroup made advances to fund trading losses incurred by Westback Purchasing Company, L.L.C.—a company owned by SemGroup's CEO and his wife. These advances to Westback were also risky as SemGroup made them without charging any interest, securing collateral, or executing contracts requiring repayment.

SemGroup's trading strategy was predicated on stability in oil prices. Between July 2007 and February 2008, however, oil prices were erratic. The price volatility resulted in SemGroup having to post large margin deposits, which in turn, compelled SemGroup to draw on its credit line. From July 2007 to February 2008, SemGroup's borrowings grew from $800 million to more than $1.7 billion.

After being informed that SemGroup transferred its trading book in July 2008, the Bank Group declared that SemGroup was in default of the Credit Agreement due to its substantial losses on options trades in 2007 and 2008.[1] After the Bank Group declared SemGroup in default, SemGroup filed for bankruptcy on July 22, 2008. On October 28,

---

[1] It does not appear that the Bank Group declared a default based upon the option trading strategy pursued by SemGroup or the loans to Westback. Nor does it appear that SemGroup attempted to conceal its trading activities or loans to Westback or otherwise engaged in fraud.

2009, the bankruptcy court confirmed a plan of reorganization, which became effective on November 20, 2009. The plan created a litigation trust and vested the trust with the claims held by the SemGroup estate.

The court-appointed Trustee commenced two adversary proceedings against SemGroup equity holders, seeking to avoid equity distributions approved by SemGroup's management in August 2007 and February 2008.[2] The Trustee sought to avoid these distributions as constructively fraudulent transfers based on two theories: (1) SemGroup was left with unreasonably small capital after the equity distributions; and (2) SemGroup was insolvent on the date of the 2008 distributions. The bankruptcy court denied the unreasonably small capital claim as to the 2007 equity distribution on summary judgment and the insolvency claim after a trial. *See In re SemCrude, L.P.*, No. 08-11525 (BLS), 2013 WL 2490179 (Bankr. D. Del. June 10, 2013). The District Court affirmed, *see In re Semcrude, L.P.*, 526 B.R. 556 (D. Del. 2014), and this appeal followed.

II.

The Bankruptcy Court had jurisdiction over the initial proceedings under 28 U.S.C. § 1334. The District Court exercised jurisdiction to review the bankruptcy appeal

---

[2] In August 2007, SemGroup distributed approximately $90 million to its equity holders, of which about $23 million went to Defendants Ritchie SG Holdings LLC, SGLP Holdings, Ltd., and SGLP US Holding, LLC (collectively the "Ritchie Appellees"), and $2.8 million went to Appellee Cottonwood Partnership, LLP. In February 2008, SemGroup distributed approximately $100 million to its equity holders, of which about $26 million went to the Ritchie Appellees and $3 million was paid to Cottonwood. Only the distributions to the Ritchie Appellees and Cottonwood are at issue in this litigation.

4

under 28 U.S.C. § 158(a). We have appellate jurisdiction to review the District Court's ruling under 28 U.S.C. §§ 158(d) and 1291. "We exercise plenary review over the District Court's appellate review of the Bankruptcy Court's decision and exercise the same standard of review as the District Court in reviewing the Bankruptcy Court's determinations." *In re Miller*, 730 F.3d 198, 203 (3d Cir. 2013) (internal quotation marks and citations omitted). "We review a bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *Id.* (brackets, internal quotation marks, and citations omitted).

As it pertains to this case, our review of the grant of summary judgment is *de novo*. *See In re G–I Holdings, Inc.,* 755 F.3d 195, 201 (3d Cir. 2014). With respect to the trial, only the Bankruptcy Court's admission of expert witness testimony is at issue. "We review the decision to admit or reject expert testimony under an abuse of discretion standard." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994)).

III.

The Trustee seeks to void SemGroup's 2007 and 2008 equity distributions as constructively fraudulent transfers pursuant to section 5 of the Oklahoma Uniform Fraudulent Transfer Act ("UFTA"), 24 Okla. Stat. Ann. § 116, and the United States Bankruptcy Code, 11 U.S.C. § 548. The Bankruptcy Appellate Panel for the Tenth Circuit has noted that "the Oklahoma UFTA and § 548 are identical, and cases construing the elements under § 548 are persuasive interpretations for the UFTA." *In re Solomon*,

5

299 B.R. 626, 633 (B.A.P. 10th Cir. 2003) (footnote omitted).[3] Because Section 548 of the United State Bankruptcy Code is at issue, and because the parties focus primarily on the United States Bankruptcy Code, our analysis will focus on the relevant elements under the United States Bankruptcy Code.

## A. The Unreasonably Small Capital Claims

The Trustee contends that both the 2007 and 2008 equity distributions should be set aside pursuant to 11 U.S.C. § 548(a)(1)(B)(ii)(II).[4] A transaction by a debtor may be set aside as constructively fraudulent under this Bankruptcy Code provision if it can be shown that the debtor (1) "received less than a reasonably equivalent value in exchange for such transfer or obligation;" and (2) "was engaged in . . . a transaction . . . for which any property remaining with the debtor was an unreasonably small capital[.]" *Id.*[5] The

---

[3] Under the strong-arm provision of the United States Bankruptcy Code, the Trustee can also avoid any of SemGroup's transactions that would be voidable under state law. *See* 11 U.S.C. § 544(b)(1) (granting the power to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim").

[4] The parties vigorously dispute whether the Trustee waived her unreasonably small capital claim with respect to the 2008 distribution. Appellees argue that the Bankruptcy Court's summary judgment ruling only addressed the unreasonably small capital claim in the context of the 2007 distribution and the Trustee did not question the scope of the Bankruptcy Court's ruling when the matter proceeded to trial on only the 2008 distribution. We, however, need not resolve the waiver issue, because the facts underlying the unreasonably small capital claims are essentially the same for both distributions and the Bankruptcy Court's rationale for rejecting the claim as to the 2007 distribution applies with equal force to the 2008 distribution.

[5] To void SemGroup's equity distributions under the Oklahoma UFTA, the Trustee was required to demonstrate (1) that SemGroup made the transfers "without receiving a reasonably equivalent value in exchange for the transfer" and (2) "was

Bankruptcy Court found, and it is undisputed, that the Trustee satisfied the first of these requirements because "no reasonably equivalent value was provided" for the equity distributions. *See In re SemCrude, L.P.*, 2013 WL 2490179, at *5. Accordingly, the dispositive question here is whether, following either equity distribution, SemGroup was "left with an unreasonably small capital under the circumstances." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1071 (3d Cir. 1992).

It is indisputable that, in determining whether SemGroup was left with an unreasonably small capital following the equity distributions, the Bankruptcy Court properly considered the availability of credit under the Credit Agreement. *See id*. at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital."). There is also no dispute that SemGroup was adequately capitalized if it could borrow the amounts available to it under the Credit Agreement. Indeed, SemGroup continued to have access to the credit facility after each of the equity distributions. What is hotly contested is whether SemGroup would have been able to draw on its line of credit if the Bank Group knew of its allegedly improper trading strategy.

Pointing to our statement in *Moody* that "the test for unreasonably small capital is reasonable foreseeability," *id*., the Trustee argues that SemGroup's projected reliance

---

engaged . . . in a . . . transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction[.]" 24 Okla. Stat. Ann. § 116(A)(2)(a).

7

upon its continuing ability to draw upon its line of credit was not "reasonable" given that

its trading strategy was prohibited by the terms of the Credit Agreement. Stated

otherwise, the Trustee asserts that it was reasonably foreseeable at the time of the equity

distributions that SemGroup would not have access to its line of credit because its trading

strategy violated the Credit Agreement. The Trustee argues that there are at least

questions of fact material to the issue of whether it was reasonably foreseeable that the

Bank Group would have pulled their line of credit as a result of SemGroup's derivatives

trading.

Both the Bankruptcy Court and the District Court reasoned that the Trustee's

argument rested upon conjecture biased by hindsight such that it was not reasonably

foreseeable that SemGroup would lose access to credit when it made the challenged

equity distributions. *See Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794 (7th Cir.

2009) ("[A] term like 'unreasonably small' . . . is fuzzy, and in danger of being

interpreted under the influence of hindsight bias."). The Bankruptcy Court explained:

> Case law . . . teaches that as a general proposition, hindsight
> should not be used to answer the question of unreasonably
> small capital. . . . Here the availability of the bank facility
> provided the Debtor with actual liquidity sufficient to operate
> its business going forward. There is no material allegation of
> fraud or criminal conduct by [SemGroup], but there is an
> allegation of trading activities that were beyond what was
> permitted under the terms of the bank facility. . . . These cases
> in Bankruptcy Court always present a context of a failed
> business, and there is a temptation . . . to use hindsight to
> establish whether a debtor was adequately capitalized, and . . .
> that's a temptation to be avoided, because it would

8

improperly expand fraudulent conveyance law far beyond its proper borders. . . .

Here, to accept the plaintiffs' theory, the Court would have to disregard the actual facts of adequate capitalization for SemGroup and imagine what would have happened had [its] trading practices become known to the lenders. And I note that the parties dispute whether the speculative trading was disclosed. Defendants have offered substantial support that the trading in fact was disclosed either in the Debtors' financial reporting, in its footnotes or otherwise, including the affiliate transactions that relate to Westback, and the plaintiffs similarly contend that it was not sufficiently or adequately disclosed or that to the extent it was disclosed that those disclosures were countervailed by [SemGroup's] representations that it was, in fact, not engaging in speculative trading. Regardless of this admittedly live dispute, there is no significant allegation of fraud or "cooking the books" by SemGroup, and I am exceedingly reluctant to engage in the speculative exercise that the plaintiffs propose . . . .

First, I observe that I am dubious, frankly, of the proposition that the line would have simply been pulled or that that is even the most likely result. There is a range of options, a broad range of options from pulling the line, to restructuring it, to requiring a sale of assets to pay down a portion of the line, to imposing restrictions on the Debtors' trading activity, to simply doing nothing. All of which can be plausibly explained or anticipated to have occurred in 2007. And because neither I nor anyone . . . can demonstrate which of these options would have occurred or would have been . . . likely to have occurred, I defer to the wisdom of the case law that limits the use of hindsight and discourages the consideration of later information absent circumstances that are not present here.

(J.A. 42, 44, 45–46, 47.)

The District Court similarly explained:

> There . . . can be no dispute that, at the time of the two distributions at issue, SemGroup had a substantial line of credit. [The Trustee] maintains in this regard that she at least raised a genuine issue of material fact sufficient to withstand summary judgment as to "whether it was reasonably foreseeable that SemGroup would be unable to sustain its operations due to its massive breach of the Credit Agreement" and the likely termination of the credit facility provided thereunder. (D.I. 18 at 10)
>
> It is not clear from the record whether or not the Bank Group was aware of the business activities identified by appellant as being inconsistent with SemGroup's obligations under the Credit Agreement. As recognized by the bankruptcy court, however, it makes no difference. If the Bank Group was aware of such, [the Trustee']s position collapses on itself, for there is no forecast to make—SemGroup's access to credit had not been withdrawn at the time of either of the distributions despite the "massive" breach of the Credit Agreement. If the Bank Group was not aware of such activities, one has to engage in multiple levels of forecasting in order to embrace [the Trustee's] position. More specifically, in the cases relied on by the parties, the courts had the benefit of historical data and of a company's financial projections going forward, the question under *Moody* being whether such future projections were reasonable at the time of the event in question (generally a distribution or LBO). Here, [the Trustee] would have the court, in effect, forecast (1) the lenders' reaction to discovering the conduct, and then (2) the consequences of that reaction, i.e., that the only option chosen by all of the lenders would have been to foreclose access to all credit, which (3) had the reasonably foreseeable consequence of bankruptcy.
>
> I agree with the bankruptcy court that what appellant proposes is a "speculative exercise" not rooted in the case law.

*In re Semcrude, L.P.*, 526 B.R. at 561.

10

We concur with these analyses. Absent the bias of hindsight, it simply cannot be said that SemGroup was likely to be denied access to a credit facility that had been in place while it was engaging in the allegedly improper trading strategy. Telling in this regard is the fact that SemGroup's trading strategy was not cited by the Bank Group when they declared a default under the Credit Agreement. As we observed in *Moody*, the test for unreasonably small capital holds debtors responsible "when it is reasonably foreseeable that [a company] will fail, but at the same time takes into account that 'businesses fail for all sorts of reasons, and that fraudulent [conveyance] laws are not a panacea for all such failures.'" 971 F.2d at 1073 (second alteration in original) (quoting Bruce J. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L. Rev. 469, 506 (1988)). In this case, the Trustee cannot show that SemGroup could reasonably foresee either that its trading strategy would fail or that the Bank Group would declare a default based upon that trading strategy. The Trustee presented no evidence that SemGroup tried to disguise its trading strategy from the Bank Group or acted deceptively. From SemGroup's perspective, it was acting transparently vis-à-vis the Bank Group in connection with its trading strategy. Under these circumstances, it cannot be said that it was reasonably foreseeable that its capitalization was unreasonably small because it would lose its ability to draw upon its credit facility. Accordingly, the Bankruptcy Court did not err in

11

granting summary judgment in favor of the Appellees on this aspect of the Trustee's constructive fraud claim.[6]

## B. The Insolvency Claim

The Trustee also challenges the 2008 equity distribution as constructively fraudulent on the ground that SemGroup was insolvent when that distribution was made. Under the United States Bankruptcy Code, the Trustee may void SemGroup's 2008 equity distribution if she can demonstrate SemGroup (1) "voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or

---

[6] Appellees argue that we may affirm the Bankruptcy Court's ruling on the unreasonably small capital claim on the alternative ground that the Trustee cannot show a causal link between the equity distributions and the adequacy of SemGroup's capitalization. In other words, Appellees assert that the distributions must be the cause of undercapitalization. Appellees point out that the premise of the Trustee's argument is that "SemGroup's derivatives trading, and its purported impact on SemGroup's access to credit, caused SemGroup to lack sufficient capital." (Ritchie Appellees' Br. 20.) There may be some force to this argument. After all, in *Moody*, we observed that the concept of unreasonably small capital denotes "a standard of causation which looks for a link *between the challenged conveyance and the debtor's insolvency*." 971 F.2d at 1071 (emphasis added). Other courts have concluded that the contested transaction must be the cause of the small capital condition. *See, e.g., In re Terrific Seafoods, Inc.*, 197 B.R. 724, 736 (Bankr. D. Mass. 1996) ("I must determine whether the transfer caused [the debtor] to engage in business with 'any property remaining [being] an unreasonably small capital.'") (citing 11 U.S.C. § 548(a)(2)(B)(ii)); *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (interpreting the Bankruptcy Code to require that "the disputed transfers *cause* the unreasonably small capital condition.") (citing 11 U.S.C. § 548(a)(2)(B)(ii)). The Trustee vigorously disputes the necessity of establishing a causal relationship between the challenged distribution and the debtor's capitalization at the time of the distribution. According to the Trustee, the only question is whether the debtor was undercapitalized at the time of the distribution, and not what caused that status. We, however, need not resolve the question of whether there must be a causal link between the challenged transaction and the status of the debtor's capitalization in this case because it cannot be shown that it was reasonably foreseeable at the time of the equity distributions that SemGroup would lack adequate access to capital.

obligation;" and (2) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]" 11 U.S.C. § 548(a)(1)(B)(ii)(I).

As was the case for SemGroup's 2007 equity distribution, the Bankruptcy Court found that "no reasonably equivalent value was provided" for SemGroup's 2008 equity distribution. *See In re SemCrude, L.P.*, 2013 WL 2490179, at \*5. After conducting a three-day bench trial, exclusively focused on whether SemGroup was insolvent at the time of its 2008 equity distribution, the Bankruptcy Court concluded that "the Trustee did not carry her burden to prove that [SemGroup] w[as] insolvent when [it] made the 2008 Distributions." *Id.* at \*11. On appeal, the Trustee argues that the Bankruptcy Court's holding on this claim should be vacated because it purportedly relied upon inadmissible expert witness testimony. Specifically, the Trustee contends that the Bankruptcy Court should not have allowed the Appellees' expert, Michael Lederman, to opine that SemGroup was solvent at the time of the 2008 equity distribution because Lederman improperly relied upon a June 2008 valuation prepared by Goldman Sachs.

"Under the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). We have explained that the "Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243

13

(3d Cir. 2008) (citation omitted).  In particular, we have explained that Rule 702 "has a liberal policy of admissibility." *Kannankeril*, 128 F.3d at 806.

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404.  Here, the Trustee focuses on reliability.  Stated concisely, we have explained that in order for testimony to be reliable, it must be based on appropriate methods and procedures "rather than on subjective belief or unsupported speculation; the expert must have good grounds for his o[r] her belief." *Id*. (internal quotations and citations omitted).

Here, the crux of the Trustee's argument is that Lederman did not have good grounds for his testimony because his opinion "was based entirely on a draft June 2008 valuation created . . . by Goldman Sachs, which Lederman adopted wholesale as his opinion without conducting any independent analysis, providing any further input, or investigating any of the underlying assumptions." Appellant's Br. 51. The Trustee correctly notes that in *ZF Meritor, LLC v. Eaton Corp.*, we upheld a finding that an expert's reliance on a business plan was "improper because he did not know either the qualifications of the individuals who prepared the [business plan] estimates or the assumptions upon which the estimates were based."  696 F.3d 254, 291 (3d Cir. 2012). In *ZF Meritor*, however, we also clarified that, "[i]n some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* at 292.  After conducting a thorough review of

14

the record, we find that this is one of those cases where an expert may rely on the estimates of others. As such, we disagree with the Trustee's contention that this case "is indistinguishable from *ZF Meritor*." Appellant's Br. 58. Our disagreement is three-fold.

First, *ZF Meritor* is distinguishable because in that case the plaintiff's expert simply "relied on a one–page set of profit and volume projections" to calculate damages. *See* 696 F.3d at 292. Here, on the other hand, Lederman utilized the Goldman Sachs valuation, which, as the Bankruptcy Court noted, was contemporaneously prepared in 2008 and not made in anticipation of litigation. *Cf. Id.* at 292 ("Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections."); *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) ("[I]n determining whether a value is objectively 'reasonable' the court gives significant deference to marketplace values."), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003). Buttressing the Bankruptcy Court's conclusion that the Goldman Sachs report was sufficiently reliable for purposes of Lederman's opinion was the fact that it was prepared in anticipation of a contemplated securities offering under Rule 144A of the Securities Act of 1933. As the Bankruptcy Court noted, Goldman Sachs undertook significant due diligence in connection with its valuation efforts that "consisted of frequent conversations with SemGroup's management, access to a data room containing documents posted since SemGroup's credit agreement was originally drafted in 2005, and 'due diligence sessions' with SemGroup's management through 2008." 2013 WL 2490179, at *10.

Second, while the Trustee is correct that this case is similar to *ZF Meritor* insofar as Lederman did not know who at Goldman Sachs created the report, *see ZF Meritor*, 696 F.3d at 293, this case is still distinguishable because Lederman had previously worked for Goldman Sachs. Accordingly, it cannot be said that Lederman did not "know the methodology used to create the [Goldman Sachs Report] or the assumptions on which the [Goldman Sachs Report's] price and volume estimates were based." *Id.* In other words, the Trustee did not show that Lederman "'lack[ed] . . . familiarity with the methods and reasons underlying [Goldman's projections.]'" *Id.* (quoting *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir. 1993)).

Finally, *ZF Meritor* is distinguishable because Lederman did not simply adopt the Goldman Sachs' evaluation as his own. Instead, Lederman used his own analysis and judgment to adjust the Goldman Sachs Report to account for SemGroup's speculative derivative trading by using the Ritchie Appellees' trading expert, Joseph Graham. As the Bankruptcy Court explained, "any effect of unknown speculative trading is adequately quantified and adjusted for in Lederman's valuation, which adopted Graham's analysis." *In re SemCrude, L.P.*, 2013 WL 2490179, at \*10. We find it sufficient that Lederman's opinion was grounded on his own analysis and judgment, as supplemented by an analysis in the record that was produced by another expert.

In closing, we emphasize that, for admissibility purposes, the proponents of expert testimony "'do not have to demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a

16

preponderance of evidence that their opinions are reliable.'" *Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir. 2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744). Under the deferential abuse of discretion standard, we will not disturb a trial court's decision to exclude testimony unless we are left with "'a definite and firm conviction that the court below committed a clear error of judgment.'" *ZF Meritor*, 696 F.3d at 293 (quoting *In re TMI Litig.,* 193 F.3d 613, 666 (3d Cir. 1999) (citation omitted)). Here, the Trustee does not clear that high hurdle. Because the Goldman Sachs Report was a contemporaneous report capturing the marketplace value; Lederman explained the reasons for his reliance on the Goldman Sachs analysis; and Lederman then adjusted the Goldman Sachs valuation based on his own analysis and judgment while giving cogent reasons to support his conclusions, we do not find that the Bankruptcy Court abused its discretion in admitting Lederman's expert testimony.

## IV.

For the foregoing reasons, the Bankruptcy Court properly entered judgment in favor of the Appellees. We will affirm the District Court's ruling affirming the judgment of the Bankruptcy Court.

17