**In re GOLDEN MANE ACQUISITIONS, INC., Debtor.**

**Bankruptcy No. 96–08754–BGC–11.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Dec. 19, 1997.

Eric J. Breithaupt, Birmingham, AL, for Debtor.

Jesse S. Vogtle, Jr., Birmingham, AL, for Alabama Power Company.

W. Dennis Schilling, Birmingham, AL, for Jeffrey Hersh.

Marvin Franklin, Birmingham, AL, for Glenn Mazer.

Edward F. Danowitz, Jr., Atlanta, GA, for Robert Postell.

### Order Approving the Compromise with, and the Payment of Monies to, Glenn I. Mazer

BENJAMIN COHEN, Bankruptcy Judge.

## I. Findings of Fact and Conclusions of Law

### A. Background

On September 3, 1996, the claimant, Glenn I. Mazer, obtained a judgment of approximately $250,000.00 against the debtor; Jeffrey L. Hersh, the sole owner of the debtor; and J. Randle Jackson, the president of the debtor. On October 25, 1996, the claimant recorded that judgment in the Probate Court of Jefferson County, Alabama. The resulting lien attached to an office building owned by the debtor in Birmingham, Alabama.

On December 4, 1996, the debtor filed the pending Chapter 11 bankruptcy petition and on May 23, 1997, filed a first amended disclosure statement and plan of reorganization that classified the recorded judgment as an unsecured claim.[1] The debtor based its classification of the claim on the theory that the secured nature of the claim would be avoided as an 11 U.S.C. § 547 preferential transfer.

On June 18, 1997, the claimant objected to the proposed plan and claim classification, contending that no preference had occurred and that the claim was secured by the recorded judgment. In settlement of their differences, the debtor and the claimant filed a *Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor* on June 27, 1997. That compromise, the compromise at issue before the Court, provided that the claimant would be allowed a *secured* claim for $268,000.00, (a reduction of the interest enhanced amount of approximately $281,000.00 as of July 1997) and that the claimant would not seek to enforce his right to any further interest, an amount that the parties calculate would accrue at approximately $2,500.00 per month.

On July 8, 1997 the debtor filed a second amended disclosure statement and plan of reorganization that embodied the terms of the compromise.

On July 14, 1997, Alabama Power Company (the "Company"), a creditor of the debtor, filed an *Objection to Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor and the Second Amended Plan of Reorganization and Liquidation.*[2] In that motion, the Company contended that the claimant's judgment perfection did constitute a preferential transfer that should be avoided and thus, the pending claim should be treated as an unsecured claim. On July 28, 1997, Robert Postell, another creditor of the debtor, filed an *Objection to Claim of Glenn I. Mazer* in which he contends substantially the same as the Company. On July 29, 1997, the Company file an *Objection to Claim* based on the same grounds.[3] All of

---

1. The parties agree to, and have stipulated to most of, these background facts.

2. As stated, the debtor's first amended plan classified the Glenn Mazer claim as unsecured and the second amended plan, in conformity with the settlement proposal, classified the claim as secured. All creditors received notice of and were allowed to vote on the first plan. They have not had an opportunity to vote on the second.

3. The parties did not present detailed information on the basis of the claimant's judgment. Such information is however important because there is some concern by the parties opposing

the compromise that because the judgment was rendered against both the 100% shareholder of the debtor and its president, in addition to the debtor, that if the compromise is approved and the debtor pays the judgment in full, both the 100% owner and its president will receive an undeserved benefit. In furtherance of their position, the opponents argue that the debtor has not prosecuted the potential preference action because of the benefit that the principals of the debtor will receive through settlement of the claim.

This Court does not believe that in order to decide the pending matter that it must decide

these pleadings, including the motion for approval of the compromise, are before the Court.[4]

## B. Contentions

The opponents of the compromise and settlement contend that the status of the contested claim should be decided only through prosecution of a preference action pursuant to 11 U.S.C. § 547, and if it were, that the recording of the claimant's judgment would be avoided resulting in an unsecured claim.[5] The proponents of the pending compromise and settlement seek to establish the amount of the claim without litigating the preference issue.

## C. Standard of Review

The principal matter before the Court is the settlement proponents' *Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor.* The Court reviews that motion under the directives of the Court of Appeals for the Eleventh Circuit contained in *Wallis v. Justice Oaks II, Ltd., (In re Justice Oaks II, Ltd.),* 898 F.2d 1544 (11th Cir.1990), cert. denied sub nom. *Wallis v. Justice Oaks II, Ltd.,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990).[6] In *Justice Oaks II,* Chief Judge Gerald B. Tjoflat explained the process for reviewing a settlement proposal. He wrote:

> When a bankruptcy court decides whether to approve or disapprove a proposed settlement, it must consider:
>
> (a) The probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection;
>
> (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;
>
> (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Martin v. Kane (In re A & C Properties),* 784 F.2d 1377, 1381 (9th Cir.) (quoting *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d 1128, 1135 (8th Cir.1984), cert. denied, 469 U.S. 1207, 105 S.Ct. 1169, 84

---

any legal issue associated with a benefit to the principals if the compromise is approved. There is however an equitable consideration. Certainly, the state court found both the principals and the debtor liable for the now contested judgment. And this Court cannot now alter that judgment. But as a Court of equity, deciding an equitable issue, that is whether the compromise is in the paramount interest of creditors where the 100% shareholder of the debtor will benefit directly from the compromise, this Court should be able to consider the basis of the judgment. If the claimant's judgment arose from a business relationship with the debtor, and the principals of the debtor became defendants only by virtue of their positions with the debtor, then this Court (although not addressing the issues of contribution and indemnification) would find that the debtor, not the principals, was the direct beneficiary of the settlement. Laws allowing the creation of corporations for this very purpose are the bases of day-to-day business transactions. See this Court's discussion in *In re Coala,* 182 B.R. 887 (Bankr.N.D.Ala.1995). On the other hand, if the claimant's relationship was not with the debtor but others, and the judgment arose out of such a business relationship, then the question of whether the principals should benefit so tremendously from payments by the debtor, may be a question this Court should address.

In this regard the Court finds, based on Debtor's Exhibits 8(6); 8(13); and, 15 that the claimant's business relationship was first with the debtor corporation and second with the

principals. This conclusion is supported by the common knowledge that individuals who have business relationships with financially troubled corporations, commonly seek to hold principals of corporations liable for debts owed to them by the corporations, but do not, in contrast, seek to hold such corporations liable for debts of principals, who otherwise have no financial problems.

4. Technically, Mr. Mazer has a pending *Objection to Confirmation of Plan.* The Court considers that objection to be moot.

5. A debtor in possession has the authority to prosecute an action to avoid a preference having most of the rights and powers of a trustee pursuant to 11 U.S.C. § 1107(a). *United Jersey Bank v. Morgan Guaranty Trust Company (In re Prime Motor Inns, Inc.),* 135 B.R. 917, 919 (Bankr. S.D.Fla.1992). This Court has not addressed the issue of whom else may prosecute such actions, nor has this Court discussed the preclusive effect of the findings of fact and conclusions of law from this order.

6. Certainly the standards of reviewing an objection to a plan or objection to a claim are different than those utilized here to review the proponents' compromise; however, because the accompanying pleadings rely solely on the same facts and arguments as those raised against the compromise, this Court believes that whatever the standard for review would be, that the results would be the same as those reached here.

L.Ed.2d 320 (1985)), cert. denied, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

When the bankruptcy court below approved the settlement agreement between Justice Oaks, Justice, South Florida, and Allegheny, the court was required to determine only the probability of success should South Florida's and Allegheny's claims be litigated, the difficulty of collecting on those claims, the expense of litigation, and the other creditors' interests. In making these determinations, the court had to consider many factors other than the merits of South Florida's and Allegheny's claims. The court, moreover, never had to decide the merits of those claims—only the probability of succeeding on those claims. Such a determination is much like that required of a court before it may grant a preliminary injunction. See *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir.1979). *Id.* at 1549.[7]

### D. *Justice Oaks II* Factors

#### 1. Probability of Success in the Preference Litigation

 To approve the proposed compromise, this Court need not find that the debtor in possession would not be successful in recovering in a preference action against Mr. Mazer, or even that the debtor in possession would recover more money in a preference action against Mr. Mazer than is being conceded by Mr. Mazer in consideration of the proposed compromise. "Obviously it would not be a settlement if to obtain approval the [debtor in possession] would have to demonstrate that he could not succeed had the preference claim been pressed. All that he must do is establish to the reasonable satisfaction of the [bankruptcy judge] that, all

things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." *Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir.1960) (citations omitted) (parentheticals added).

#### a. Elements of a Preference

Five subsections of section 547 of the Bankruptcy Code must be satisfied before a property transfer may be considered a preference. In this case, the parties agree that four of the five have been met. These include subsections 547(b)(1), (b)(2), (b)(4) and (b)(5), that is the parties agree that the recording of the judgment claim was to or for the benefit of Mr. Mazer; was for Mr. Mazer's antecedent judgment debt; occurred on or within 90 days before the date of the filing of the debtor's bankruptcy petition; and, enabled Mr. Mazer to receive more than he would receive if the case were a case under chapter 7.[8]

The parties do not agree that a fifth element, subsection 547(b)(3), has been met, that is the parties do not agree that at the time Mr. Mazer recorded his judgment, the debtor was insolvent.[9] For the transfer to be set aside, the debtor would have to have been insolvent. The proponents, of course, contend for solvency. The opponents for insolvency. As a practical matter, if at the time of the judgment recording, the amount of the debtor's liabilities exceeded the value of its assets, the debtor was insolvent. If not, then the debtor was solvent.

#### b. Presumption

For purposes of section 547, the debtor is presumed to have been insolvent on and dur-

---

**7.** In this case, there is, at a minimum, sufficient justification for approval of the compromise in the fact that the outcome of the controversy between Mr. Mazer and the debtor in possession is uncertain, that the prospect of recovery by the debtor in possession from Mr. Mazer is doubtful, and the fact that a monetary benefit will result to creditors from concessions made by Mr. Mazer and the avoidance of the expense of wasteful litigation.

**8.** Because the parties agree that these elements are satisfied, this Court need not find specific facts to support each but only must find that there are no pertinent facts that contradict the parties agreement. In that context, this Court so finds.

**9.** A bankruptcy court's resolution of the issue of solvency is a factual finding subject to review under the clearly erroneous standard. See *Clay v. Traders Bank*, 708 F.2d 1347, 1350–51 (8th Cir.1983) and cases cited therein.

ing the 90 days immediately preceding the filing of the petition. 11 U.S.C. § 547(f). If this presumption is appropriate for current consideration, the opponents' probability of success certainly would be enhanced; however, in the pending case, the debtor presented sufficient evidence, as discussed herein, to rebut the presumption. Consequently, the presumption is of no benefit to the opponents.

### c. Evidence

Most courts agree that for purposes of section 547(b)(3), the solvency of a transferee is to be determined as of the time of the transfer.[10] In this case, that transfer is the recording of Mr. Mazer's judgment on October 25, 1996. The parties agree that at that time, the debtor's liabilities were approximately $1,400,000.00. To determine whether the debtor was solvent at that time, this Court must first determine the value of the debtor's assets as of the same time. Once that value is determined, determination of solvency is a simple mathematical calculation, as defined by section 101(32) of the Bankruptcy Code as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a *fair valuation*, . . . " 11 U.S.C. § 101(32) (emphasis added).

### (1) Valuation

"Fair valuation" in determining questions of insolvency under 11 U.S.C. § 547 has been described as:

In effect, it defines it to be a condition of permanent, as opposed to temporary, inability to pay debts. It declares one insolvent when his ability to pay his debts is not temporary through want of ready funds, but permanent through want of convertible assets. Statutory as well as commercial insolvency arises out of, and consists in, inability to pay debts. One is insolvent under the statute when his assets, if converted into case, at a fair not forced sale will not pay them.

*Mitchell v. Investment Securities Corp.,* 67 F.2d 669, 671 (5th Cir.1933).

Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within in a reasonable period of time to pay the debtor's debts.

*Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),* 78 F.3d 30, 35 (2nd Cir. 1996).

Traditionally, courts have employed a "balance sheet test" to determine a debtor's insolvency. See, e.g., *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 577 (1st Cir.1980) (using balance sheet test); *Syracuse Engineering Co. v. Haight,* 110 F.2d 468, 471 (2d Cir.1940) (same). This balance sheet test was used under the Bankruptcy Act, and Congress intended that courts continue to use it under the Bankruptcy Code.[FN3]

FN3. The legislative history to the Bankruptcy Code definition of "insolvent" provides:

The definition of "insolvent" in paragraph (25) is adapted from section 1(19) of current law. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of property exempted or fraudulently transferred. It is the traditional bankruptcy balance sheet test of insolvency.

H.REP. NO. 95–595, 95th Cong., 1st Sess. 312 (1977), reprinted in 2 Appendix COLLIER ON BANKRUPTCY 312 (15th ed. L. King 1992).

The law is well settled that the value of an asset under the balance sheet test is neither the asset's value in the best case, nor is it the asset's value in the worst case. See, e.g., *Sleepy Valley, Inc. v. Leisure*

---

**10.** "To avoid a transfer as preferential, the plaintiff must prove that the debtor was insolvent at the time the allegedly preferential transfer occurred." *Gillman v. Scientific Research Products Inc. of Delaware (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 554 (10th Cir.1995). *See also Harvey v. Orix Credit Alliance, Inc. (In re Lamar Haddox Contractor, Inc.),* 40 F.3d 118, 121 (5th Cir.

1994); *Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Sabrina S.P.A. (In re R.M.L., Inc.),* 195 B.R. 602, 611 (Bankr.M.D.Pa.1996); *First Trust Nat'l Assoc. v. American Nat'l Bank and Trust Co. of Chicago (In re Adventist Living Ctrs., Inc.),* 174 B.R. 505, 511 (Bankr.N.D.Ill.1994); *Friedman v. Ginsburg (In re David Jones Builder, Inc.),* 129 B.R. 682, 689 (Bankr.S.D.Fla.1991).

*Valley, Inc. (In re Sleepy Valley)*, 93 B.R. 925, 927 (Bankr.W.D.Tex.1988). Rather, most courts have assigned assets their market value at the time of the disputed transfers when assessing asset values. See *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985) (balance sheet test focuses on fair market value of debtors assets and liabilities within reasonable time of transfer). "[F]air market price is the most equitable standard." *Syracuse Engineering Co. v. Haight*, 110 F.2d 468, 471 (2d Cir.1940) (citations omitted). Assets, therefore, are best valued by determining what price they would bring on the open market. See *Energy Cooperative, Inc. v. Cities Service Co. (In re Energy Cooperative)*, 109 B.R. 822, 824 (N.D.Ill.1989); *Sleepy Valley*, 93 B.R. at 927 (Bankr. W.D.Tex.1988); cf. *Excello Press, Inc. v. Bowers, Inc. (In re Excello Press, Inc.)*, 96 B.R. 840, 842 (Bankr.N.D.Ill.1989) (fair value is what can be realized from converting assets into cash). An open market value, or simply, market value, has been further defined as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller. See *Grandison v. National Bank of Commerce of Rochester*, 231 F. 800, 804–05 (2d Cir.1916); *Irving Trust Co. v. Manufacturers' Trust Co.*, 6 F.Supp. 185, 187 (S.D.N.Y.1934).

Under this willing buyer/willing seller approach to valuing assets, it is not appropriate to deduct the costs and expenses associated with the sale of the assets. In determining a debtor's insolvency, a court must examine the actual values of the assets and not arbitrary values assigned by the debtor. See *Shaw v. United States Rubber Co., Naugatuck Chemical Division*, 361 F.2d 679, 682 (5th Cir.1966) (depreciated cost improper method).

The balance sheet approach calls upon the court to compare the value of the assets and the amount of liabilities of the bankrupt at the time of the transfer. The value of these assets is ... its [sic] fair market price, what a willing buyer would pay under ordinary selling conditions. Clearly, that market price would not include any of the costs of sale.

See *Hunter Press, Inc. v. Connecticut Bank & Trust Co. (Matter of Hunter Press)*, 420 F.Supp. 338, 341 (D.Conn. 1976). The method of market price valuation focuses on what a willing buyer would pay, not necessarily what a willing seller would ultimately receive. Accordingly, the Debtor as seller may not reduce the value of its assets by real estate transfer taxes which might be incurred incident to sale.

Of course, the value of an asset may be reduced by factors regarding the difficulty of the sale of the asset. See, e.g., *Coyle v. Archibald McNeil & Sons Co.*, 284 F. 298, 300 (S.D.N.Y.1922) (fair market value lower than face value if property subject of extended litigation); *Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.)*, 93 B.R. at 931 (reduction in value appropriate where no ready market). However, such factors affect the market price of the asset and do not relate to the cost of sale. See *Hunter Press*, 420 F.Supp. at 341.

The balance sheet value of an asset may be further adjusted by the net cost of making the asset marketable. Expenditures made to increase the value of the asset may be considered in asset valuation, as such expenses are "not merely incident to the selling of it." See *Hunter Press*, 420 F.Supp. at 341–42 (improper to include attorneys fees or title search expenses to value real property).

"A fair valuation" of a debtor's assets, therefore, must concern itself with the price a debtor could obtain at open market, not the net proceeds of the sale. A balance sheet, after all, is a financial snapshot of the debtor, used for a comparison of assets to liabilities. To reduce the value of a debtor's assets by the hypothetical costs associated with the sale of the assets, such as real estate transfer taxes, is to distort the focus of the debtor's financial picture. "[I]t is the actual, rather than the theoretical condition of the debtor which determines [insolvency]." See *Mitchell v. Investment Securities Corp.*, 67 F.2d 669, 671 (5th Cir.1933).

*Pioneer Home Builders, Inc. v. International Bank of Commerce (In re Pioneer Home*

*Builders, Inc.)*, 147 B.R. 889, 891–892 (Bankr.W.D.Tex.1992)

The most difficult question is the meaning of fair valuation. Collier on Bankruptcy contains a long explanation that will not be repeated here. 2 Collier on Bankruptcy S 101.26[4] (15th ed.1984). The gist of the explanation is that fair value does not mean the amount the property would bring in the worst circumstances or in the best, but the amount it would bring if the debtor took a reasonable time to collect its debts and sell its property. For example, a forced sale price is not fair value though it may be used as evidence on the question of fair value. Likewise, the fair value of sala-

ble assets is not what they would sell for in the slow process of the debtor's trade as if the debtor were continuing in business unhampered. The general idea of fair value is the amount of money that the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts.

*Jahn v. Reading Body Works, Inc. (In re A. Fassnacht & Sons, Inc.)*, 45 B.R. 209, 217 (Bankr.E.D.Tenn.1984).[11]

11. Mr. Postell contends that the debtor corporation was on its financial "deathbed" when Mr. Mazer recorded his judgment. He therefore contends that the fair value of the debtor's assets as of the date of the transfer would be their liquidation value. This Court disagrees with Mr. Postell's argument. While the evidence does not suggest that the debtor was by any means flourishing financially when Mr. Mazer's judgment was recorded, it does indicate that the debtor was operating on that date. The fact that the debtor was renting office space and collecting rent on the date of the transfer indicates that it had not yet given up. The evidence also suggests that the debtor's subsequent bankruptcy filing was precipitated more by the anticipation of Mr. Mazer's foreclosure of his judgment lien, than by a complete inability to operate. The fact that the debtor, on the date of the transfer, may have been treading water, with an eye toward selling the property for a fair market price which, in the opinion of the owner, was an amount that at least would have been sufficient to pay all of the debtor's creditors, does not in itself prove that the debtor was defunct as a going concern on that date.

The "deathbed" theory is applied primarily in cases involving debtors that owned a variety of chiefly movable and intangible assets used in the operation of a business, such as a manufacturing plant. The theory is that if the business is a "going concern," then the value of the business as a "going concern," including all of its assets, goodwill and customer base, would ordinarily be greater than the value of its assets sold separately, without any value being assigned to goodwill and customer base. As stated by the court in *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339 (Bankr.D.Minn.1985) *aff'd in part and rev'd in part on other grounds*, 850 F.2d 1275 (8th Cir. 1988):

Unlike the traditional market value approach, however, going concern valuation incorporates more than a summation of market values attributable to an entity's various assets. It indicates the market value of an ongoing business

as a whole and thereby includes an additional element of value that attaches to property, considered in the aggregate, by reason of the property having been assembled for the conduct of the business and the property's fitness for such use. This additional increment of value reflects in part, not only the business' earning power, but the ready availability of customer lists, established supply lines, and other attributes making it possible for a purchaser to step in and immediately commence operations.

56 B.R. at 386 (citations omitted).

The same considerations would not seem to apply in a case where the primary business of the debtor is to operate and hold for resale one major item of real property, since the value of the debtor is, practically speaking, in that circumstance, synonymous with the fair market value of the real estate, and there is no concern for bootstrapping the value of a number of assets based on their value as a unit in the operation of a particular enterprise. The degree of occupancy of real estate and the manner in which real estate is being used are universally evaluated and taken into consideration when arriving at a fair valuation of real property, so that additional discount of value because of a real estate debtor's lack of operation prior to bankruptcy is unwarranted. In that sense, the only effect of the "deathbed" theory on real estate debtors is to remove from any consideration the valuation of the debtor as a going concern, not to replace the concept of fair market valuation with a distressed or forced sale valuation. "Only where a business is wholly inoperative, defunct, or dead on its feet, will going concern valuation be abandoned in favor of an item by item fair market valuation." *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 387 (Bankr.D.Minn.1985) *aff'd in part and rev'd in part on other grounds*, 850 F.2d 1275 (8th Cir.1988).

This Court, consequently, has serious reservations as to what degree the "deathbed" theory of valuation is relevant in a case involving, in es-

**970**

### (2) Asset Value

For purposes of determining the fair value of the debtor's principal asset, the evidence of value that warrants serious consideration is: (1) a November 22, 1996 letter of intent establishing a potential selling price for the debtor's building at $1,500,000.00; (2) the debtor's schedules; (3) two post-petition contracts to purchase the property, one including a contingency contract for the sale of the building for $1,500,000.00; and, (4) the eventual sale of the property on July 16, 1997 for $1,050,000.00.[12]

On November 22, 1996, LTS Group of Dallas, Texas, sent the debtor a "firm Letter of Intent precedent to a formal Purchase and Sale Agreement for the Acquisition of..." the debtor's building. The terms of that letter were accepted by the debtor on December 5, 1996, and the agreed on price of sale was $1,500,000.00.[13] Almost immediately after the judgment was recorded, the claimant started a process to collect his judgment, as evidenced by his recording of the

judgment on October 25, 1996 shortly after the judgment was rendered on September 3, 1996. When the debtor filed its bankruptcy petition on December 4, 1996, less than 45 days after the judgment was recorded and only one day before accepting the terms of the November 22 letter of intent, the debtor listed the value of its assets as $1,560,000.00 and its liabilities as $1,404,753.56.[14]

On June 11, 1997, a hearing was held on the debtor's *Motion for Authority to Sell Property of the Estate by Private Sale Free and Clear of All Liens and other Interests to Sloss Development Group, Inc.*, and objections, if any. The debtor proposed to sell the real estate in controversy to the Group, pursuant to the debtor's contract with the Group, for $1,500,000.00. The motion was subsequently withdrawn. Also on June 11, 1997, a hearing was held on the debtor's *Motion for Authority to Sell Property of the Estate by Private Sale Free and Clear of All Liens and other Interests to E & W Proper-*

sence, a single asset real estate debtor, except to the extent evidence is presented which indicates to what degree lack of occupancy or operation *has actually effected the market value* of the real estate. There is no such evidence before the Court. This Court must assume that the manner and extent of the debtor's operation of the building are already reflected in the fair valuation of the property as made herein from the evidence presented, and that no additional adjustment of that valuation would be warranted even if the debtor was, which the Court does not find, on its "deathbed" when the transfer occurred.

Mr. Postell argues also that even if a fair market value standard is applied, that theoretical costs of sale, such as a real estate commission, should be deducted from the theoretical price that would make up the fair value of the property on the date of the transfer. This Court also rejects that argument and believes that according the debtor's assets their "going concern" or "fair market" value mandates that theoretical costs of sale, such as real estate commission, not be deducted from the theoretical price that would make up the fair value of the property on the date of the transfer. "The method of market price valuation focuses on what a willing buyer would pay, not necessarily what a willing seller would ultimately receive." *Pioneer Home Builders, Inc. v. International Bank of Commerce (In re Pioneer Home Builders, Inc.),* 147 B.R. 889, 892 (Bankr.W.D.Tex.1992).

**12.** Expert testimony was offered. The evidence related by that testimony was out of line with what this Court considers, based on all of the

other evidence, reasonable. Consequently, the Court does not give that testimony or evidence much weight. On the other hand, all of that evidence was offered by the proponents and if given *any* weight, that evidence would add support to approval of the compromise.

**13.** The Court places great weight on this evidence because the Court must assume that the debtor did not file its bankruptcy case, within 90 days of the judgment recording, solely for the purpose of defeating the claimant's security. From the beginning of this case, the Court and the debtor both assumed that this case, *unlike* most, would be one of those cases that would follow a difficult, but possible, route of completion within a short time of filing. Had the debtor's sale been consummated, this would have been the result. Unfortunately, this case, *like* most, became ensnared in the many problems associated with Chapter 11 cases. But in terms of weight to be given to the evidence, this Court cannot ignore the good intentions and good possibilities associated with the filing, and must consider those facts in weighing the evidence of the value of the building at the time of the transfer.

**14.** This Court has not discussed the nature of or the value of any property of the debtor other than its building. While the evidence proved that there was other property that has a substantial value, because the Court finds that the value of the principal asset, for purposes of the *Justice Oaks II* factors, exceeds the debtor's liabilities, there is no need to consider the other property.

*ties, Inc.,* and objections, if any. The debtor proposed to sell the real estate in controversy to E & W pursuant to the debtor's contract with E & W for $1,050,000.00. This Court entered orders on June 12, 1997 and July 16, 1997, approving the sale of the debtor's principal asset, its building, to E & W Properties, Inc. for $1,050,000.00.[15]

■ The opponents argue that the best evidence of value of the real estate is the price obtained approximately seven months after the bankruptcy filing. Most courts would agree that evidence of such a sale is not only competent evidence in section 547(b)(3) considerations but is also pertinent evidence.[16] For that reason this Court has considered that evidence and weighed it against the opposing evidence. But for the reasons expressed below, the Court concludes that the evidence opposing the selling price is more favorable when all evidence is considered in the total context of this case.

When this case was filed, the claimant had only recently obtained a significant judgment against the debtor, recorded that judgment and had begun execution on the debtor's property to satisfy that judgment. Only one day after filing its chapter 11 petition, where the debtor had listed the value of its assets as *greater than* $1,500,000.00 and its liabili-

ties *less than* $1,500,000.00, the debtor accepted the terms of a buyer willing to purchase its predominant asset for $1,500,000.00, an amount exceeding the debtor's liabilities. It was not until the property was sold that there was any serious dispute that the property was not worth $1,500,000.00. And in fact at the very time that there was the ultimately accepted offer to purchase the property for $1,050,000.00 there was a competing offer for $1,500,000.00.[17]

The opponents appear to rely solely on the building's selling price. They did not object to the value evidence submitted by the proponents. And other than the selling price there is no evidence contrary to the proponents' contended value.[18]

Based on the above, the Court finds that the value of the debtor's assets was, at the time the claimant recorded his judgment, at least $1,500.000.00, an amount exceeding the debtor's liabilities of approximately $1,400,-000.00.[19] For purposes of the limited application of the solvency factor in 11 U.S.C. § 547(b)(3), the Court finds, pursuant to 11 U.S.C. § 101(32) that the debtor was solvent at the time the claimant recorded his judgment. Consequently, for purposes of determining likelihood of success on the merits of a theoretical preferential transfer action, the

---

**15.** Of course the argument can be made that simple offers to purchase are not competent evidence of the fair market value of real estate. The evidence discussed above is however far more than that. All of the above documents involve written agreements between parties to purchase real estate.

**16.** "The admission in evidence of the price brought at the trustee's sale lends probative force to the asset evaluation and is competent evidence to establish insolvency." *Mizell v. Phillips,* 240 F.2d 738, 741 (5th Cir.1957). *See also Ely v. Greenbaum,* 85 F.2d 501, 503 (2nd Cir.1936); *Burns Bros. v. Cook Coal Co.,* 46 F.2d 31, 32 (3rd Cir.1931); *Elliotte v. American Sav. Bank & Trust Co.,* 18 F.2d 460, 461 (6th Cir.1927); *Healy v. Wehrung,* 229 F. 686, 689 (9th Cir.1916); *Ridge Ave. Bank v. Studheim,* 145 F. 798, 800–801 (3rd Cir.1906); *Bloch v. Farjeon (In re Bloch),* 109 F. 790, 793–794 (2nd Cir.1901); *In re Star Spring Bed Co.,* 257 F. 176, 178 (D.N.J.1919) *aff'd,* 265 F. 133 (3rd Cir.1920); *Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.),* 192 B.R. 477, 489 (Bankr.N.D.Ill.1996); *Coated Sales, Inc. v. First Eastern Bank (In re Coated*

*Sales, Inc.),* 144 B.R. 663, 677–678 (Bankr. S.D.N.Y.1992); *Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.),* 143 B.R. 468, 478–479 (Bankr.E.D.Tenn.1992) *aff'd,* 112 F.3d 234 (6th Cir.1997); *Murphy v. Valencia (In re Duque Rodriguez),* 75 B.R. 829, 832 (Bankr.S.D.Fla. 1987); *Kreis v. Shope (In re Ressler),* 61 B.R. 403, 407 (Bankr.E.D.Tenn.1986); *Neuger v. Casgar (In re Randall Constr., Inc.),* 20 B.R. 179, 184 (N.D.Ohio 1981).

**17.** That offer had some unfulfilled contingencies and was ultimately withdrawn.

**18.** But see note 11 above. While the opponents may not have offered much different evidence, they interpret the evidence offered differently from the manner the debtor and this court interpret it.

**19.** If a preference action were tried, of course there is the possibility that other evidence would be submitted.

Court finds that the creditor is more likely, than not, to prevail.

### 2. The Difficulties, if any, to be Encountered in the Matter of Collection

The second *Justice Oaks II* factor relates to collection. There is no evidence here that there would be any difficulties in collection of the claim secured by the debtor's building. If this factor is relevant to the pending inquiry, then it must weigh in favor of the compromise.

### 3. The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it

The third *Justice Oaks II* factor relates to the time and expense of the potential litigation. If this Court were to consider that this factor relates to all pending matters, that is the motion to approve compromise, the objection to that motion, the Company's objection to the debtor's second amended plan, Mr. Postell's objection to Mr. Mazer's claim, and the Company's objection to that claim, the potential litigation, if these matters are not disposed of now, is enormous.[20]

**20.** The complexity of the pending matters required the Court to consider the following questions, which this Court has done. While many remain unanswered, an awareness of them is necessary to a full understanding of this Court's reasoning and decision. Not only have the questions guided this Court's analysis of the pending matters, the questions also demonstrate the complexity of the pending matters and the complexity of any future litigation associated with them. The questions are:

1. If the settlement is approved, what would be the effect on the order approving the settlement if the debtor's plan is not confirmed? Would the order be negated or would it continue to be conclusive as to Mr. Mazer's potential preference liability? If the later is true, then would that be fair to unsecured creditors, who have an interest in collecting preferences, especially considering the fact that the creditors who have objected to the settlement may be able to block confirmation of the debtor's plan by adverse votes?

2. The motion for approval of settlement states that Mr. Mazer only agrees to the settlement on condition that the settlement is approved by the Court and no appeal is filed to the order approving the settlement? How would an appeal filed by either Mr. Postell or Alabama Power Company effect any order approving the settlement? Should the Court approve a settlement if the settlement can be subsequently defeated simply by the filing of a notice of appeal by either of those parties, or any other interested party?

3. Can, or should, the Court approve a settlement over the objections of two unsecured creditors, if the affirmative vote of those creditors will be necessary for confirmation of the debtor's plan?

4. Is the "deathbed" theory of valuation for preference purposes applicable in a liquidating Chapter 11 case involving a "single asset" debtor?

5. What effect would disapproval of the settlement have on the owner's agreement in the plan to subordinate his pre-petition unsecured claims? What amount, in dollars and cents, is the monetary effect of the owner's subordination of his pre-petition unsecured claims on the distribution to unsecured creditors?

6. Should the disposition of the potential preference claim against Mr. Mazer be made a part of the reorganization plan and determined by a vote of creditors, since it is the creditors whose interests are being adversely effected (since the interests of creditors are antithetical to the interests of the proponents of the settlement, and since all that remains, in essence, of the "reorganization" of the debtor in this case is the distribution of the money gained from the sale of the debtor's primary asset)?

7. Could approval of the settlement, since it will result in a direct benefit to the debtor's equity security holder, subvert the fair and equitable requirement for confirmation? And is not consideration of the fair and equitable requirement for confirmation also required for approval of any settlement in a Chapter 11 case?

8. Is the debtor estopped from pursuing the preference action simply because of its admission in its schedules that its assets exceeded its liabilities? Is the right to control the potential preference litigation "property" that, if the settlement is approved, will inure to the benefit of the debtor's equity security holders, rather than unsecured creditors, and thereby possibly result in a violation of the "absolute priority rule"?

9. What is the nature of the judgment against the debtor, the owner and the debtor's president? Is the debtor entitled to contribution or reimbursement from the others for any sums paid on the judgment by the debtor? If so, then who will pursue the others for that contribution or reimbursement? To what extent does the owner's agreement to subordinate his pre-petition unsecured claim represent *de facto* contribution or reimbursement?

10. Who will finance the litigation against Mr. Mazer if the settlement is not approved? Will the estate bear any litigation costs if the settlement is not approved and the litigation against Mr. Mazer is successful? Will the estate bear any litigation costs if the settlement is not approved and the litigation against Mr. Mazer is unsuccessful?

Consequently, if this factor is relevant to the pending matters, it must weigh in favor of the compromise.[21]

### 4. The Paramount Interest of the Creditors and a Proper Deference to their Reasonable Views in the Premises

The fourth *Justice Oaks II* factor relates to the creditors interests. The parties strongly disagree on this element.

■ In a similar case this Court recognized that when the best interest of creditors *will not be served* by settlement of potential litigation, such a settlement *should not be approved.* In *In re Speir,* 190 B.R. 657 (Bankr.N.D.Ala.1995) *aff'd by* CV–95–AR–2518–S (October 17, 1995), this Court considered whether a Chapter 7 trustee's proposed settlement of an action to set aside a fraudulent transfer should be approved. In that case, a creditor obtained a judgment against the debtor prior to the transfer of certain property by the debtor to the debtor's wife. The trustee contended that the transfer was fraudulent and that the property was property of the estate subject to the claims of all creditors. In rejecting the trustee's position and the settlement this Court found that regardless of the outcome of any fraudulent transfer action, that there would be no benefit to creditors. Without that benefit, the Court could not find that a settlement was in the best interest of creditors. This Court wrote:

> If the Debtor's property transfer is not a fraudulent transfer, the property belongs

to the Debtor's wife, is not property of the estate and the trustee has no rights to the property. If the transfer is a fraudulent transfer, the objecting creditor becomes, under Alabama law, a judgment lien creditor with rights superior to those of the Trustee. In either case, the Trustee has no tangible interest in this property.

*Id.* at 661 (footnote omitted).

While the Trustee's proposed compromise and settlement satisfies three of the four criteria courts consider in deciding whether to approve such settlements, this Court finds that the proposed compromise and settlement does not satisfy the fourth criterion because the settlement is not in the paramount interest of the creditors and would not benefit this estate. The Trustee has no tangible interest in the property subject to the settlement and consequently the proposed compromise and settlement should not be approved.

*Id.* at 660.

If the Trustee had any tangible interest in the property subject to the settlement that could yield a benefit to this estate or if the objecting creditor were an unsecured creditor rather than a secured one, this Court would find that the compromise and settlement should be approved. This Court finds, however, that the Trustee does not have such an interest. Only three of the above criteria have been met. It can be said in favor of the settlement that the Trustee demonstrated that: (1) if the

11. Can this Court make an educated determination regarding the benefit of the settlement to creditors without reasonably specific evidence as to the potential costs of litigation if the settlement is not approved?

12. Do the parties anticipate that evidence in addition to or other than that presented at the trial on approval of the compromise will be offered in any preference action that may be brought against Mr. Mazer if the settlement is not approved? Do the parties anticipate that the evidence presented at the trial on approval of the compromise will have to be offered anew in any preference action that may be brought against Mr. Mazer if the settlement is not approved?

13. How long would preference litigation against Mr. Mazer take? Considering the fact that the second plan has not been submitted to creditors for a vote, how long will any preference litigation actually delay confirmation of the debtor's plan? Since the money that will be distributed to creditors is in an interest bearing account, what prejudice will result to creditors

from a delay in distribution that may occur pending the resolution of any such litigation? Can a preliminary partial distribution be made to other creditors pending the resolution of that litigation, while funds necessary to pay Mr. Mazer in full (assuming that the settlement is not approved and Mr. Mazer is paid the full amount of interest on his claim) are retained in an interest bearing account?

14. In dollars and cents, what is the estimated benefit to creditors of this settlement, as compared to the estimated costs to creditors, and overall financial detriment to creditors, if the settlement is not approved and the preference litigation against Mr. Mazer is unsuccessful?

15. If the settlement is approved, when will a distribution of funds on hand take place?

21. The expense, delay and inconvenience associated with further litigation are discussed in Part D.4.

Trustee were to prosecute any action against the Debtor involving the transfer of property to the Debtor's wife that there is the possibility that the trustee would lose the litigation; (2) if such an action were brought that it would in all respects be complex; (3) and that, the expense and delay in bringing such an action would be substantial. This Court cannot find, however, that the recovery provided for the Trustee in the settlement would yield any benefit to the estate as the Trustee would not be able to assert an interest to that recovery that would be superior to or in excess of the interest of Mr. Crawford; consequently, the fourth criterion, that the settlement is in the paramount interest of the creditors, is not satisfied.

*Id.* at 661.

The above-described circumstances do not exist here. There are specific benefits to all creditors if this compromise is approved. Much of the interest due the claimant will not have to be paid. Litigation cost (in time and money) will be eliminated. All creditors, if the debtor's plan is confirmed, will be paid sooner than later. And if there is further litigation of the preference issues, this Court believes that the proponents of the compromise are more likely than not to prevail. The consequences of this belief are, that not only would additional time and money be spent on further litigation, but that the outcome would, more likely than not, be the same as the one that this Court reaches here.

All parties agree that if the claim is paid as a secured claim, that unsecured creditors will be paid a dividend of 28.6%. All parties agree that if the claim is paid as an unsecured claim that unsecured creditors will be paid 48%. The opponents of the compromise argue that the element of the creditors' para-

mount interests is not satisfied because if the compromise is allowed to stand, unsecured creditors will in fact be paid less than if the compromise is denied. This Court disagrees. At this stage in this litigation, whether the compromise is approved or not is not the deciding factor in determining the amount that will be paid to unsecured creditors. That amount was decided when the claimant recorded his judgment and the judgment attached to the debtor's property. Whether the claim is a secured claim (which this Court believes is more likely than not) or not, is now the issue. The compromise is only the vehicle. In reaching this litigation stage, the parties have relinquished their abilities to control the outcome. In fact, the compromise *may not appear to be* in the creditors' immediate monetary interests, but the compromise reflects what this Court believes are the realities of the circumstances, that is regardless of this or any other litigation, Mr. Mazer's claim is probably a secured claim, to be paid as a secured claim, and the effect of that payment on the unsecured creditors' dividends is what it is. The benefit to creditors, for purposes of the *Justice Oaks II* factors is that this litigation ends and further delay and cost are eliminated. But if further litigation is not avoided, the issues raised by the questions listed above become issues. The delays and inconvenience to the parties that would occur if any Court were required to answer those questions is almost incomprehensible. Consequently, the Court must recognize that the settlement is, overall and in the long run, in the paramount interest of creditors.[22]

## II. Conclusion

In *Florida Trailer and Equip. Co. v. Deal,* Circuit Judge John R. Brown explained the importance of settlements. He wrote:

> the preference litigation would more likely be resolved in favor of Mr. Mazer than not, then Mr. Mazer has a secured claim against the debtor and has a lien against the real property of the debtor to secure a judgment against the debtor. Whether the corporation is entitled to contribution from the 100% shareholder is not an issue this Court has addressed. Similarly this Court has not considered any other issues relating to the relationship of the 100% shareholder to the corporation.

---

**22.** As stated earlier, the opponents argue that the settlement should not be approved because to do so would benefit an insider, the 100% shareholder of the debtor, because the owner would not be responsible for paying the judgment claim while the unsecured creditors would suffer a loss because corporate money that would otherwise go to them would be used to pay the claim. Regardless of what this Court may think about the equities of the settlement in terms of its benefit to the 100% shareholder of the debtor corporation, the fact remains that if this Court is correct and

Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and hence no basis for a compromise.

*Florida Trailer and Equip. Co. v. Deal,* 284 F.2d at 571.

For the reasons expressed herein, the Court finds that the *Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor* is due to be granted; the *Objection to Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor and the Second Amended Plan of Reorganization and Liquidation,* overruled; Mr. Postell's *Objection to Claim of Glenn I. Mazer,* overruled; and the Company's *Objection to Claim,* overruled.

It is therefore **ORDERED, ADJUDGED AND DECREED** that:

1. The *Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor* filed by the Debtor and Mr. Glenn Mazer is **GRANTED**;

2. The *Objection to Joint Motion to Approve Compromise and Payment of Monies to Secured Creditor and the Second Amended Plan of Reorganization and Liquidation* filed by Alabama Power Company is **OVERRULED**;

3. The *Objection to Claim of Glenn I. Mazer* filed by Robert Postell is **OVERRULED**;

4. The *Objection to Claim* filed by Alabama Power company is **OVERRULED**; and

5. The *Objection to Confirmation of Plan* filed by Glenn I. Mazer is **MOOT**.